Lois F. FRITZ, Plaintiff,

v.

**OLD AMERICAN INSURANCE COMPANY, Defendant.**

**Civ. A. No. 71–G–146.**

United States District Court,
S. D. Texas,
Galveston Division.

Feb. 2, 1973.

Thomas B. Foster, Jr., Houston, Tex., for plaintiff.

Thomas P. Sartwelle, of Fulbright, Crooker & Jaworski, Houston, Tex., for defendant.

## MEMORANDUM AND ORDER

NOEL, District Judge.

Plaintiff, Lois F. Fritz, seeks recovery under an accident insurance policy issued by defendant, Old American Insurance Company, for the death of her son, Loy L. Hooks, in an automobile accident. Defendant refuses to pay, claiming no policy was in effect because Hooks' death occurred before the contract of insurance was consummated. Because the material facts are not in dispute, the parties submitted the case to the Court by means of cross motions for summary judgment.

In October or November of 1969, Hooks received by mail a one-page brochure and application soliciting his purchase of an accident insurance policy from defendant. A copy of the brochure is reproduced in the Appendix. The policy was to cover death or dismemberment resulting from accidents involving automobiles or public conveyances with maximum benefits of $15,000.00. The brochure described the policy in considerable detail. It included a schedule of benefits, a listing of exclusions, and indicated age requirements of from 16 to 70 years of age. As an introductory offer, the premium for the first 30 days was only $.25, due with the application. Thereafter, premiums were $6.25 for six months, or $12.00 per year.

The application required only four entries by the applicant; his date of birth, the beneficiary's name and relationship to the applicant, and the applicant's full signature. Hooks separated the application from the brochure, completed the form and mailed it to defendant along with the $.25 premium. No further action was necessary by Hooks to obtain coverage and none was taken.

The application reached defendant between noon, November 13 and noon, November 14 and was stamped by defendant's employee. On November 17, the application was reviewed by an employee for completeness, legibility, signature and birth date. On November 19, defendant's electronic data processor searched into records to determine if Hooks had an excessive number of policies with the company. He did not. Defendant engaged in no other underwriting procedures. Defendant's data processor printed a policy with an effective date of November 21. The policy was mailed to Hooks. The application was not part of the policy and was not returned to Hooks.

On November 15, Hooks was killed in an automobile accident. Plaintiff, as beneficiary of the policy, filed timely proof of the accident and demanded payment. Defendant refused. Plaintiff brought suit in state court and the case was removed to this Court under its diversity jurisdiction. 28 U.S.C. § 1332 (1970).

Having reviewed the arguments and authorities presented by the parties, the Court concludes that although traditional Texas legal principles might support defendant's position, defendant's use of the mails as its insurance agent is a unique fact which must be considered. Upon weighing this factor, the Court finds (a) an insurance contract was consummated, (b) plaintiff's decedent was covered at the time of the accident, and (c) plaintiff must prevail.

■■ Defendant relies on the general rule that an insurance application is an offer by the individual to contract. American Life Insurance Co. v. Nabors, 124 Tex. 221, 76 S.W.2d 497 (1934). A completed application must be unconditionally accepted by the insurance company before a binding contract is made. Mutual Life Insurance of New York v. Anderson, 408 S.W.2d 335 (Tex.Civ.App. —Dallas, 1966, no writ).

Defendant claims to incorporate these principles in its procedures. The brochure refers to the document prepared

by the individual as an application. Immediately above the signature line on the application is the sentence, "I understand that the policy becomes effective when issued." And toward the end of the brochure's text is the statement "just as soon as your application is approved at the company's home office, your policy will be put in force and mailed to you." Thus, defendant's mail-out is intended to be a proposal to contract. By completing and mailing the application, the individual offers to contract. Defendant accepts the offer by processing the application. No contract is consummated until the processing is complete. Under this view of the facts, because defendant's procedures were not completed prior to Hooks' death, no contract was ever effectuated and thus no recovery can be granted.

Plaintiff points to the application form and brochures' conflicting statements as to when coverage begins. The above quoted sentences suggest two different dates—when the policy is issued and when it is approved. Another sentence in the brochure states, "And when you apply . . . . you are provided death and dismemberment coverage from accidents." This indicates a third date for coverage—when the application is sent to the company. Plaintiff contends that because contractual ambiguities are to be construed against the draftsman, a rule of construction particularly appropriate in insurance situations, the insurance policy became effective when Hooks sent in the application. United Founders Life Insurance Co. v. Carey, 363 S.W.2d 236 (Tex.1962).

■ On balance, Texas cases support defendant's position. Although defendant's brochure could lead an individual to believe that coverage began when the application was sent in, the individual applicant's understanding of the policy is apparently not the general standard of contract interpretation. Texas law generally allows the insurance company to set the terms and requirements of acceptance without regard to the expectations of the applicant. Smith v. Rio Grande National Life Insurance Co., 227 S.W.2d 579 (Tex.Civ.App.—Fort Worth, 1950, writ ref'd.). Because defendant apparently did not intend for the contract to be consummated until the application was processed, that intention would ordinarily control.

Nonetheless, a unique fact present in this case is defendant's use of the mails in conducting its insurance business. The question here is whether this factor requires application of a different test. The several sentences concerning the completion date of the contract are ambiguous. Because defendant operated by mail, no human agent was available to refute or confirm the reasonable expectations engendered by the brochure in the mind of the applicant. Under these unique circumstances, the question arises as to what standard determines when the contract is made and coverage begins—the intention of the insurance company or the reasonable expectations of the applicant.

Unfortunately, there is no Texas precedent dealing with mail order insurance. The Court is without the usual *Erie* guideposts. Only two reported cases have been found which involve this new form of insurance solicitation. Klos v. Mobil Oil Co., 55 N.J. 117, 259 A.2d 889 (1969); Fuller v. Standard Oil Co. (Indiana), 1 Ill.App.3d 799, 274 N.E.2d 865 (1971). The somewhat analogous situation of machine-dispensed flight insurance has produced several cases but none from Texas. E. g., Steven v. Fidelity & Casualty Co. of New York, 58 Cal.2d 862, 27 Cal.Rptr. 172, 377 P.2d 284 (1962); Lachs v. Fidelity & Casualty Co. of New York, 306 N.Y. 357, 118 N.E.2d 555 (1954).

■ The better and more carefully reasoned of these non-Texas cases apply the "reasonable expectations" test in

this type of situation.[1] This position is logically appealing and the Court is persuaded that it is the view courts in Texas and other states will take in the future when faced with this problem.

In the leading case involving mail solicitation of insurance, the Supreme Court of New Jersey unanimously held that the insurance company's brochure and applications were offers, accepted when the applicant mailed in his completed application with coverage beginning at the time most favorable to the applicant. Klos v. Mobil Oil Co., supra.

The opinion noted the complete explanation of the coverage in the brochure, the emphasis on quick action by the individual, the absence of a physical examination requirement, and the limited underwriting procedures undertaken by the company. These factors convinced the court that the brochure and application were a complete offer. Deposit of the completed application into the mail constituted acceptance of the offer under the terms specified in the application. In construing the contract to determine date of coverage, the court observed,

> Furthermore, although the application form in the present case stated that there would be no coverage "until" the policy issued, we believe that the average layman who reads that phrase reasonably believes he will be covered when he receives his policy. That expectation is particularly well founded where, as here, the literature which was issued by American stressed the urgency of procuring coverage as soon as possible. 259 A.2d at 893–894.

Thus the Klos court used the layman's reasonable expectations of coverage as the standard to interpret an insurance policy procured by mail.

An analogous and more frequently litigated method of impersonal insurance solicitation is machine-dispensed flight insurance found in air terminals. Defendant's insurance here is additionally comparable to flight insurance because of the short duration of the introductory term. See Travelers Insurance Co. v. Anderson, 210 F.Supp. 735 (W.D.S.C. 1962). The two leading cases interpreting these contracts are Lachs v. Fidelity & Casualty Co. of New York, supra, and Steven v. Fidelity & Casualty Co. of New York, supra.

Lachs involved insurance purchased from a machine located directly in front of a "nonscheduled" airline's counter. Language in the policy and on the machine itself restricted coverage to "scheduled" airlines. Nonetheless, the court held in favor of the beneficiaries of a decedent-policy holder who flew on a "nonscheduled" airline.

The court used the expectations of a reasonable man as the standard governing the contract's interpretation. The physical appearance of the machines to the potential insurance purchaser was given considerable attention. Finally, the court required insurance companies operating in this manner to assume greater care in accurately describing their policies to purchasers.

The California court in Stevens also held in favor of the beneficiaries despite clear language in the policy excluding coverage under the facts of the case. The court tested the facts against the knowledge and understanding of a reasonable layman and gave effect to his reasonable expectations. The opinion emphasized the mass nature of the distribution scheme and the inanimate nature of the salesman. The court held that in this situation, any provision of non-coverage must be conspicuous, plain and clear.

Other cases involving machine-dispensed flight insurance, although reach-

---

1. For a general discussion of the reasonable expectations concept, see, R. Keeton, Law of Insurance § 6.3 (2d ed. 1972); Perlet, The Insurance Contract and the Doctrine of Reasonable Expectations, 6 Forum 116 (1971).

ing differing results on their facts, have tested insurance clauses against the reasonable expectations of the buyer. E. g., Messina v. Mutual Benefit Health & Accident Ass'n, 228 F.Supp. 865, (D.D. C.1964), aff'd 121 U.S.App.D.C. 328, 350 F.2d 458, cert. denied 383 U.S. 908, 86 S.Ct. 888, 15 L.Ed.2d 663 (1965); Mutual of Omaha Insurance Co. v. Russell, 402 F.2d 339 (10th Cir. 1968).

Use of the reasonable expectations test by these courts reflects the inapplicability of traditional contract theory to this type of insurance marketing. Non-human means of solicitation such as the mails, newspaper insert, or vending machine, are relatively new but rapidly expanding methods of merchandising insurance. These methods allow the insurance company to reach large numbers of potential customers at relatively small expense. For the potential customer, they provide a quick and easy means of obtaining low-cost insurance coverage.

The absence of an insurance agent does, however, create problems. Although an agent's main responsibility is to the company, he provides many services for the individual policyholder. When the individual has questions concerning the timing, extent, or limitations of coverage or about the assessed premiums, he can turn to the agent for advice and assistance. This communicative function is absent when the agent is missing. Only the advertising brochure or other printed material is available to explain the intricacies of the policy. Oblique or legally technical language may obscure facts critical to the individual's unique situation. Thus, to maintain the concept of two informed contracting parties, it is logical to impose a greater duty on the insurance company to clearly and completely explain its policy in the advertising brochures, applications, and other material provided the individual. See Fidelity & Casualty Co. of New York v. Smith, 189 F.2d 315 (10th Cir. 1951). Given the relative ignorance of the individual, and the absence of an informed agent to answer questions, the company must assume a greater duty to fully and accurately inform the individual of the facts of his policy. Rosen v. Fidelity & Casualty Co. of New York, 162 F.Supp. 211, 214 (E. D.Pa.1958). In this situation more than any other, the company must be held accountable for misstatements and ambiguities in its literature. Thomas v. Continental Casualty Co., 225 F.2d 798, 801 (10th Cir. 1955). And, of course, the company must not be allowed to imply one type of coverage and, after the premium is received, deliver a policy providing different coverage. See Springfield Fire & Marine Insurance Co. v. Hubbs-Johnson Motor Co., Tex.Com. App., 42 S.W.2d 248 (1931).

Where the non-human device is used, it is logical to require the company to satisfy the applicant's reasonable expectations which were generated by the media chosen by the company. Cf. Merrill v. Fidelity & Casualty Co. of New York, 304 F.2d 27 (6th Cir. 1962). And when disputes over coverage arise, this standard should govern the contract's interpretation. See, contra, First National Bank of Chicago v. Fidelity & Casualty Co. of New York, 428 F.2d 499 (7th Cir. 1970), cert. denied, 401 U.S. 912, 91 S. Ct. 878, 27 L.Ed.2d 811 (1971).

This Court affirms the reasoning of these cases and holds that when the potential insurance purchaser cannot consult with an agent to ascertain the parameters of the proposed policy, the concept of an informed meeting of the minds is a myth unless the insurance company clearly and explicitly explains the policy in its literature. To effectuate this goal, the reasonable expectations which such literature raises or does not rebut must govern the interpretations of such policies.

■ Applying the reasonable expectations standard to this case, the Court

concludes that plaintiff must prevail. The individual in Hooks' position could justifiably assume that if he correctly filled out the application and mailed it, he was then covered by the promised insurance. In legal terms, the brochure and application constitute an offer by the insurance company. Deposit of a completed application into the mails is acceptance by the individual. And coverage under the policy begins immediately upon acceptance.

The source of these expectations is the brochure itself. As in the *Klos* case, the brochure's full description of the policy, the absence of a physical examination requirement, and the brevity of the application, leave the impression that defendant is offering insurance which the individual can quickly and easily accept.

The specifics of the policy are predetermined and leave nothing open for negotiation. Defendant's underwriting procedure renders rejection of an applicant only a remote possibility. The insurance company does not occupy its usual role of offeree, seriously considering the applicant's offer. Instead, defendant is the offeror and its brochure and application comprise the offer to contract.

Acceptance of the offer required the accurate completion of the application and its deposit in the mail. Hooks successfully completed these steps. The Court thus finds that a contract was made.

Finally, the Court must determine the effective date of coverage. Defendant's procedures produce an insurance policy marked with an effective date which is seven days after the application is first received by the company. In this case, defendant received Hooks' application on November 14, and the effective date

stamped on the policy was November 21. Defendant would obviously argue that this is the date coverage began and therefore Hooks was not covered on November 15, the date of his accident.

This interpretation ignores the plain language of the brochure and the reasonable expectations which the brochure raises. The brochure emphasizes the fact that coverage can be obtained quickly and easily. "Act Now," the reader is told in large letters, "Tomorrow may be too late." This language implies that an application mailed one day provides coverage for an accident occurring the next day. It certainly does not suggest that coverage will not begin for seven days or more. The thirty-day introductory offer is tailored to the needs of those embarking upon an extended business trip or vacation who need travel insurance of limited duration. The vacationer who drops the application in the mails as he leaves town could reasonably expect coverage for the duration of the trip. He certainly would not expect his thirty days of coverage to begin seven days or more after he mailed his application. Defendant's time lag is inconsistent with these expectations and must fall. Given the language of the brochure, the most reasonable expectation is that coverage begins as soon as the offer is accepted which is when the application is deposited in the mail. The Court so concludes.

In conclusion, by interpreting the facts to satisfy the reasonable expectations of the applicant, the Court has found that a contract of insurance was formed and in effect at the time of Hooks' fatal automobile accident. Judgment will be rendered for plaintiff.

The foregoing constitues the Court's findings of facts and conclusions of law.

See Appendix on next page.

APPENDIX

# OLD AMERICAN $15000 and 00 cts *Principal Sum*
## *Traffic & Travel Accident Policy*

5

**APPLICATION**

Date of Birth ........................................
Month     Day     Year

Beneficiary........ .     ....... . ...................................
First Name   Middle Initial   Last Name

Relationship of Beneficiary.. ...................................

To the best of my knowledge and belief, I am sound mentally and physically. **I understand that the policy becomes effective when issued**

Signature: X
First Name   Middle Initial   Last Name

ID2000  Old American Ins. Co. / 4900 Oak St., K.C., Mo.

## 30 DAYS COVERAGE ONLY 25¢
### THIS INTRODUCTORY OFFER IS FOR

To apply for your policy just complete this application and mail today with 25¢.

Indicate any change to name and/or address of addressee by crossing out and inserting correct information.

**THIS POLICY IS ISSUED TO PEOPLE 16 to 70**

**OLD AMERICAN**
4900 OAK STREET
KANSAS CITY, MISSOURI 64141

DP AP511 BA

DETACH ALONG DOTTED LINE

**act now . . .**

**. . . tomorrow may be too late**

If you DO take this step, it may be one of the most important in many a moon.

You need this kind of insurance in this day and age of high-speed automobiles, trains and planes, turnpikes and freeways, congested streets and busy crosswalks.

And when you apply for OLD AMERICAN'S $15,000 Principal Sum Traffic and Travel Accident Policy at the introductory rate of 25¢ for the first 30 days, you are provided death and dismemberment coverage from accidents . . .

. . . while you are riding in, driving, entering or alighting from any private passenger automobile (whether owned by you or not);

. . . while as a passenger (whether fare-paying or on a pass) you are riding in, entering or alighting from any land, air or water passenger common carrier -- whether a bus, taxicab, street car, train, plane or boat;

. . . or if as a pedestrian, you are struck or run over by an automobile or common carrier vehicle while you are on any public street or highway.

Now -- here are the benefits payable under the policy:

IF YOU ARE KILLED        $15,000.00

IF YOU LOSE
Sight of both eyes       $15,000.00
Both hands               $15,000.00
Both feet                $15,000.00
One hand and one foot    $15,000.00
One hand and one eye     $15,000.00
One foot and one eye     $15,000.00
One hand                 $ 7,500.00
One foot                 $ 7,500.00
Sight of one eye         $ 7,500.00

You are covered for accidental bodily injuries as a result of accidents covered by this policy . . . anywhere in the world . . . any time of day or night . . . and the loss may occur any time within 180 days of the accident. After such loss the policy terminates. Where more than one loss occurs from the accident, we will pay for one of them, but always the larger benefit.

So there will be no possible misunderstanding, the policy does not cover losses caused by the covered person's intoxication unless administered on the advice of a physician, sickness, disease or infirmity, war, any act incident to war, carbon monoxide gas

-- or while the insured is in wartime military service of any country, or while working as a paid chauffeur, fireman or law enforcement officer, or taking part in any stunt exhibition, race or speed test.

The policy is issued only to people between 16 and 70 and may be renewed with the company's consent until your 71st birthday for only $12.00 a year, or $6.25 each six months.

Just as soon as your application is approved at the company's home office, your policy will be put in force and mailed to you. Incidentally, this is not a short term trip policy. Instead, it can be a vital part of your whole insurance program.

Remember -- sudden catastrophic accidents can make things look pretty dark for your family.

So take advantage of this opportunity -- while you have the application in front of you.

Sincerely,

Joseph J. McGee

Joseph J. McGee
President