OPINION OF THE COURT
Jerome C. Gorski, J.
This matter comes before this court by way of plaintiff’s motion for summary judgment, as well as the motions of each defendant for summary judgment.
Plaintiff received a solicitation, on or about December 23, 1988, from defendant Charles J. Sellers & Company, Inc. (hereinafter, Sellers) to purchase disability income insurance through its agency with Paul Revere Life Insurance Company (hereinafter, Paul Revere). According to the solicitation, enrollment was available to the membership of defendant N. Y. Criminal & Civil Courts Bar Association (hereinafter, NYCCCBA). Plaintiff responded to the solicitation, and completed the application for disability insurance. Along with the application, plaintiff sent a premium check for the amount specified in the application. He also tendered his check for membership dues in the NYCCCBA. Plaintiffs application was denied, the check for the premium was returned, and no policy was ever formally issued to the plaintiff.
Plaintiff seeks to enforce the provisions of the policy, however, based on the statements made in the solicitation from Sellers which stated “guaranteed issue — underwriting waived”; “coverage will be offered during the charter enrollment regardless of past medical history”. It is the position of the defendant, Paul Revere, that the guaranteed enrollment did not apply to plaintiff, who was a new enrollee to the organization, and moreover, that the solicitation was merely that, and did not form the basis of a contract. Said defendant refers to the specific language of the application itself which states: “Applicants will be informed whether or not their application has been accepted within 60 days or be given a reason for any further delay” and “No agent or broker has the authority to waive the answer to any question, to determine insurability, to waive any of the company’s rights or requirements, or to make or alter any contract or policy”. Defendant Sellers takes the position that it was authorized to extend the offer of guaranteed insurance to plaintiff, and that defendant Paul Revere should be bound by the terms of the solicitation it authorized. Defendant Siller *682 avers that it is not liable as it was not a party to the offering, only a marketing vehicle for the plan.
Under these factual circumstances, the court must decide whether the submission of a signed application for disability insurance by plaintiff, along with payment of the initial premium, constituted the formation of a contract, giving rise to a cause of action for breach of said contract. The general rule is that an insurance application constitutes nothing more than an offer to the insurer, which it may accept or reject after determining whether an applicant is a desirable risk. (Prudential Ins. Co. v Snyder, 142 Misc 150 [1928], affd 229 App Div 852 [1930].) An application in no way binds an insurer to issue a policy. (Bullis v Metropolitan Life Ins. Co., 85 Misc 2d 209 [1976].)
There are, however, situations under which it has been held that the solicitation itself formed an offer and the application with premium constitutes an acceptance. Such a situation arises where the soliciting literature spelled out the terms of the insurance, the scope of the insurance coverage, the intention of the insurer to accept applicants irrespective of their age or health, and nothing was left open to negotiations. (Klos v Mobil Oil Co., 55 NJ 117, 259 A2d 889 [1969].) In Klos, plaintiff was the holder of a Mobil Oil credit card and as a member of that group was solicited to purchase an accident insurance policy from American Home Assurance Co. The solicitation provided the available coverages which applicant could check. Plaintiff checked a certain box, which provided that for $9 per quarter, his beneficiary would receive $25,000 if he met with accidental death. Attached to the solicitation was an application, and the solicitation stated that Mobil “ ‘takes pride in Offering you’ its policy” (55 NJ, at 122, 259 A2d, at 892). The court held that the solicitation with application constituted an offer which the cardholder was free to accept or reject, and the only question for the court was the effective date. In that case, however, there was a policy that was delivered to the plaintiff prior to a claim for enforcement.
Similarly, in the case of Fritz v Old Am. Ins. Co. (354 F Supp 514 [SD Tex 1973]), the United States District Court, relying on Klos (supra), held that a life insurance policy was effective upon the mailing of the application wherein the solicitation had no underwriting requirements nor physical examination requirement, and a reasonable person would expect that if he correctly filled out the application form and mailed it, coverage would be effecuated. In that case, even though there were state *683 ments in the application that stated that the insurance application is subject to acceptance by the insurer, the “reasonable expectation” of the applicant was controlling. In that instance, the reasonable expectation, as derived from the solicitation, was that insurance could only be rejected in the remotest of circumstances, and therefore, coverage was in effect upon the mailing of the application.
This line of reasoning was adopted in the matter of Riordan v Automobile Club (100 Misc 2d 638 [1979]). In that case, plaintiff purchased travel accident insurance from a solicitation in a mailing from the American Automobile Association. The solicitation stated, “ ‘Your Club membership automatically qualifies you to enroll’ ” (at 640). Plaintiffs mailed the enrollment form with accompanying premium, and the court found them to be insured as of the date of mailing. The court applied what it called the “reasonable expectation” doctrine, in that the solicitation gave those targeted by same the reasonable expectation that their application would be immediately effective and that unless they were untruthful in the application, there was no reasonable expectation that they could be rejected. The court, in Riordan, analogized the situation to that presented in Lachs v Fidelity & Cas. Co. (306 NY 357), wherein the purchaser of machine-solicited flight insurance was held to be in effect as of the date purchased.
In the case at bar, the plaintiff had a reasonable expectation that the policy would be approved since it was *a “guaranteed issue” and the solicitation promised “underwriting waived”. Although some qualifying language was contained in the application itself, it was directly contradicted by the solicitation. The circumstances, considered as a whole, gave plaintiff a reasonable expectation that the policy would be issued and said would conform to the promised coverage set forth in the solicitation. In fact, the defendant, Paul Revere, confirmed that this issuance of its disability policy was to be a guaranteed issue, and that plaintiff, had he been a member of the NYCCCBA prior to the solicitation, would have been afforded coverage. (Charles D. Havens letter of Feb. 17, 1989.) Therefore, it can be reasonably concluded that the underwriting had indeed been waived for those eligible to respond to the solicitation. This court must then examine the details of the program to determine whether plaintiff was within the group of persons intended to be part of the “guaranteed” program.
The subject disability insurance program was developed through the collaboration between Paul Revere and Sellers, *684 which began approximately February 1987. Paul Revere was represented in this development phase by Stuart “Toby” Fennels, its regional sales manager. It was Sellers who contacted the NYCCCBA to see if they could sell the disability program through their membership, and thereafter, Paul Revere sought the “endorsement” of that group to help increase sales. The NYCCCBA had been in existence since 1893, and had a membership of approximately 300. The president of NYCCCBA felt that offering a guaranteed issue disability insurance policy would be a good way to increase the organization’s membership.
The defendants engaged in a marketing program which was termed as an “aggressive” plan. As stated in the Paul Revere professional marketing plan, the main reason that associations endorse insurance products is to “attract, maintain, and expand membership”. The proposal for guaranteed disability insurance, as presented to the NYCCCBA on December 9, 1987 by Sellers (exhibit S to plaintiff’s moving papers), recognizes that “it is desirable that additional attorneys join the Bar Association * * * the participation requirements may, in part, be met by new Members”. The proposal goes on to acknowledge that the percentage of members necessary to trigger the guaranteed provisions “would be adjusted to take into account the new members”. This proposal, however, has been criticized by Paul Revere as not reflecting the agreed elements of the plan, especially with regard to the applicability of new members. Mr. Fennels, however, was at this presentation, and was part of the discussion between the parties. Sidney Siller, NYCCCBA president, testified that he asked Mr. Fennels at the presentation whether new members solicited could be included in the guaranteed issue, and used as a marketing tool for new membership. At that time, Mr. Siller testified, Mr. Fennels was informed that NYCCCBA intended to solicit the entire New York State Bar membership to become members of the Association in conjunction with the marketing program. Mr. Fennels denies this allegation. Mr. Siller’s account is likewise recounted by Thomas Sellers, who was present at the presentation to Siller’s organization.
Charles Havens, vice-president of Paul Revere, at his deposition, identified an internal memo from Mr. Fennels which indicated that the NYCCCBA was planning to aggressively market the disability program such that it would use its endorsement letter, direct mail, and telephone solicitation. No one from Paul Revere ever limited the spectrum of attorneys *685 that were to be solicited for the guaranteed program by Sellers or the NYCCCBA. No Paul Revere employee or agent ever objected to the written proposal to the NYCCCBA by Sellers even though its sales manager was in attendance at the meeting at which the proposal was presented, and was available to answer questions or inquiries from the NYCCCBA Board of Directors.
Because it is clear that Paul Revere either knew or had reason to know of the full contents of the proposal being offered by Sellers, and the purpose for which the endorsement of the policy was given by NYCCCBA, it is disingenuous to now aver that Paul Revere did not know of the representations made by its employees or agents, nor did they authorize such provisions as they pertained to new members. This court can construe the acknowledged writings of the defendants as admissions on their part. In doing so, it is clear that defendant Paul Revere knew that defendant Sellers was making a certain offering for a guaranteed disability plan — such is set forth in the Havens letter of February 18, 1989. The only question presented thereafter is whether plaintiff was contemplated by defendants to be a person within the group that was to be solicited and includable in the guaranteed program. The solicitation itself does not set forth the fact that new members to the NYCCCBA are excluded from the guaranteed plan. Therefore, as against defendant Sellers, author of the solicitation, it is clear that liability rests if it is determined that it acted without real or apparent authority to make those new members eligible for the guaranteed plan.
Defendant Sellers, a “Gold Broker” of Paul Revere, quite clearly acted within the authority of Paul Revere. Paul Revere was aware of the offering being made, and acknowledges same in the aforementioned “Havens” letter. The fact that it was being used as a marketing tool by defendant NYCCCBA was not only known to them, but insisted upon by Paul Revere in its marketing plan, which calls for aggressive marketing. The presence of the regional sales manager of Paul Revere (Fennels) at the presentation before the NYCCCBA Board of Directors is persuasive. The meeting included a presentation of the proposed plan, which specifically accorded the same eligibility for the plan to new members. The acknowledgement of the existence of an internal memorandum from the regional sales manager (Fennels) to the vice-president (Havens) clearly evidences Paul Revere’s full understanding that the guaranteed disability plan was to be made available to new and existing *686 members alike. The failure of Paul Revere to put specific limitations on the applicability of the guaranteed plan to new members despite its clear understanding that Sellers and NYCCCBA were using the disability plan as a marketing tool is fatal to their defense herein. It strains credibility that a sophisticated insurance carrier would limit applicants in the scenario described above. Neither Paul Revere nor the NYCCCBA would benefit under Paul Revere’s rationale. It could even be construed to have been a fraudulent solicitation.
Therefore, summary judgment is granted to the plaintiff on liability as against defendant Paul Revere. This court finds that defendant Sellers was acting within the authority granted it by its Gold Broker agreement, and by the failure of Paul Revere to clearly set forth any specific exclusions as regarding the guaranteed program’s applicability to new members. It is clear from the documents and the depositions of those associated with Paul Revere that it was fully aware that Sellers was operating under the assumption that the program would be available to new members, and in fact used that fact to attract new members to the organization. The complaint as against defendant Siller, personally, is dismissed in all respects, as is the complaint against the NYCCCBA since it was clearly operating under the same assumptions as defendant Sellers.
The court will conduct a hearing with regard to the damage aspect of this matter.